BILLIE CHERYL JONES,

      Plaintiff,

v.                              Case No.  5:18-cv-493-Oc-MCR

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

      Defendant.

_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision denying her applications for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI").  Plaintiff filed her applications for DIB and SSI on August 27, 2014, alleging a disability onset date of July 15, 2010, which were denied initially and on reconsideration.  (Tr. 15.)  On March 4, 2017, Plaintiff amended her alleged disability onset date to March 22, 2013.  (*Id.*)  On April 18, 2017, a hearing was held before Administrative Law Judge ("ALJ") Rhonda S. Greenberg at which Plaintiff was represented by counsel.  (Tr. 61-78.)  On August 30, 2017, ALJ R. Dirk Selland held a supplemental hearing at which Plaintiff was again represented by counsel.  (Tr.

_____

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge.  (Doc. 18.)

36-59.)  On October 3, 2017, ALJ Selland found Plaintiff not disabled from July 15, 2010[2] through the date of the decision.[3]  (Tr. 15-28.)  Plaintiff is appealing the Commissioner's final decision that she was not disabled during the relevant time period.  Plaintiff has exhausted her available administrative remedies and the case is properly before the Court.  (Tr. 1-3.)  The Court has reviewed the record, the briefs, and the applicable law.  For the reasons stated herein, the Commissioner's decision is **REVERSED and REMANDED**.

## I.    Standard

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence

---

[2] The ALJ considered Plaintiff's claim based on her alleged disability date of July 15, 2010 even though Plaintiff had amended her alleged disability onset date to March 22, 2013.  (Tr. 15-16.)

[3] Plaintiff had to establish disability on or before December 31, 2014, her date last insured, in order to be entitled to a period of disability and DIB.  (Tr. 16.)

preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating that the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.    Discussion

Plaintiff raises two issues on appeal. First, Plaintiff argues that the ALJ failed to apply the correct legal standards to the opinion of Doyle Phillips, Jr., M.D., Plaintiff's treating physician. (Doc. 20 at 9.) Second, Plaintiff argues that the ALJ failed to apply the correct legal standards to the opinion of Colleen D. Character, Ph.D., a State agency psychological consultant. (*Id.* at 12.) Defendant counters that substantial evidence supports the ALJ's decision to assign moderate weight to the opinions of Dr. Phillips and Dr. Character. (Doc. 21 at 5.) The Court agrees with Plaintiff on the first issue and, therefore, does not address the second issue.

## A.    Standard for Evaluating Opinion Evidence

The ALJ is required to consider all the evidence in the record when making a disability determination. *See* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3). With regard to medical opinion evidence, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v.*

*Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). Substantial weight must be given to a treating physician's opinion unless there is good cause to do otherwise. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

"'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical evidence supporting the opinion, (4) consistency of the medical opinion with the record as a whole, (5) specialization in the medical issues at issue, and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). "However, the ALJ is not required to explicitly address each of those factors. Rather, the ALJ must provide 'good cause' for rejecting a treating physician's medical opinions." *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 833 (11th Cir. 2011) (per curiam).

Although a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion, *see Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984) (per curiam), 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), "[t]he opinions of state agency physicians" can outweigh the contrary opinion of a

treating physician if "that opinion has been properly discounted," *Cooper v. Astrue*, 2008 WL 649244, *3 (M.D. Fla. Mar. 10, 2008).  Further, "the ALJ may reject any medical opinion if the evidence supports a contrary finding." *Wainwright v. Comm'r of Soc. Sec. Admin.*, 2007 WL 708971, at *2 (11th Cir. Mar. 9, 2007) (per curiam); *see also Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (same).

"The ALJ is required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists, who are also experts in Social Security disability evaluation.'" *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (per curiam); *see also* SSR 96-6p (stating that the ALJ must treat the findings of State agency medical consultants as expert opinion evidence of non-examining sources).  While the ALJ is not bound by the findings of non-examining physicians, the ALJ may not ignore these opinions and must explain the weight given to them in his decision.  SSR 96-6p.

### B.    Relevant Evidence of Record

### 1.    Doyle Phillips, Jr., M.D.

On August 14, 2013, Plaintiff's treating physician, Dr. Phillips, noted that Plaintiff reported worsening depression over the previous month and experienced suicidal ideation and thoughts of methods, but no active plan.  (Tr. 386.)  He also noted that physical examination of Plaintiff revealed 8 out of 16 positive trigger points for fibromyalgia, which were tender to mild touch.  (*Id.*)  Dr. Phillips

assessed right inguinal hernia, not incarcerated or strangulated, fibromyalgia, and possible polymyalgia rheumatica.  (*Id.*)  He prescribed Flexeril and Citalopram.  (*Id.*)  On August 14, 2014, Plaintiff presented to Dr. Phillips for a follow-up appointment and reported, *inter alia*, the following symptoms:

> Patient has continued depression despite [taking] [C]italopram and [W]ellbutrin.  She is only able to tolerate one [W]ellbutrin daily; two causes jitteriness.  She has difficulty [] doing simple tasks such as opening a jar[] due to arthritis pain in the hands.  The knuckles are tender to touch[,] but do not get red or hot.  [She is] [n]ot able to do fine manipulation or keyboarding due to pain and stiffness.  She drops things at times due to pain, stiffness[,] and weakness.  The muscle pains have been worse, and [her sleep] is more disturbed.  .  .  .  She [was] able to walk[] up to [one] mile, [but] stopped [due to] hip pain [and] arthritis.  Sitting for extended periods is difficult; she has to get up and move . . . after 10-15 minutes, for about 5 minutes.  She has to lie down several times daily[] for about 30-45 minutes.  She can lift a gallon of milk at most, carrying [it for] about 20 feet; [s]he cannot do this in sustained fashion for more than 30 minutes during the day.  She is not able to squat due to the hips.  She is not able to kneel due to knee pain.  She is not able to lift things to shoulder level or above due to shoulder pain and fatiguability.  She is able to balance a checkbook; managing funds is not too difficult.  She is not able to deal with people in public.  She is not able to deal with conflict in a constructive manner due to depression/anxiety/pain or all of the above.

(Tr. 382.)  Upon physical examination of Plaintiff, Dr. Phillips found 12 out of 16 trigger points were positive for firbomyalgia.  (Tr. 383.)  Dr. Phillips assessed fibromyalgia, major depressive disorder, possible polymyalgia rheumatica, and generalized anxiety disorder.  (*Id.*)  Dr. Phillips prescribed Naprosyn, Baclofen, Lorazepam, Ambien, and Gabapentin.  (*Id.*)  He also referred Plaintiff for X-rays and recommended referrals to rheumatology, psychiatry, and for serology

testing, but noted that Plaintiff was "unable to pursue [that] at present due to lack of funds." (*Id.*)

On October 24, 2014, Plaintiff attended a follow-up visit with Dr. Phillips and complained of worsening fibromyalgia symptoms with more pain and fatigue, increased depression, and less motivation and energy. (Tr. 438.) On physical examination, Dr. Phillips noted that Plaintiff had 15 out of 18 trigger points that were positive for fibromyalgia, her widespread pain index ("WPI") was 15, and her symptom severity score ("SSS") was 7. (*Id.*) He assessed fibromyalgia, allergic rhinitis, asthma, morbid obesity, depression, and anxiety. (*Id.*) That same day, Dr. Phillips also prepared a Fibromyalgia Questionnaire and a Medical Source Statement of Ability to Do Work Related Activities (Physical). (Tr. 426-29.) On the Fibromyalgia Questionnaire, Dr. Phillips noted that Plaintiff's diagnosis of fibromyalgia lasted or was expected to last at least twelve months or longer. (Tr. 426.) He also rated Plaintiff's symptoms of pain all over, fatigue, stiffness, and tender points as moderate, and disturbed sleep as severe. (*Id.*) He noted that Plaintiff met the American College of Rheumatology ("A.C.R.") criteria for fibromyalgia and identified the location of Plaintiff's 15 tender spots. (*Id.*) He also noted that Plaintiff's WPI was 15, her SSS was 10, her symptoms had been present for more than three months, and other etiologies tested negative. (*Id.*)

In the Medical Source Statement of Ability to Do Work Related Activities (Physical), Dr. Phillips opined that Plaintiff could occasionally lift and/or carry 10

pounds or less, and could frequently lift and/or carry less than 10 pounds due to abdominal pain and right shoulder pain.  (Tr. 427.)  He also opined that Plaintiff could stand and/or walk for about 2 hours, with normal breaks, during an 8-hour workday.  (*Id.*)  Dr. Phillips opined that her impairment affected her ability to sit as she would have to periodically alternate between sitting and standing to relieve pain and/or discomfort, that she could sit for 20-30 minutes at a time, but had to change position or lie down for 10-15 minutes.  (Tr. 428.)  He also noted that Plaintiff could drive with minimal upper and lower extremity use for about one hour at a time due to upper extremity strength, hand numbness (positional), and leg pains.  (*Id.*)  He also opined that Plaintiff could occasionally crouch, but could never climb ramps, stairs, ladders, ropes, or scaffolds.  (*Id.*)  He explained that Plaintiff's knee pain prevented her from kneeling and crawling, crouching was extremely limited to about 5 minutes at a time due to her back and leg pain, and that "she [did] not use ladders, etc."  (*Id.*)

With respect to Plaintiff's manipulative limitations, Dr. Phillips opined that she was limited in reaching in all directions, fingering (fine manipulation), and feeling (skin receptors).  (Tr. 429.)  He explained that Plaintiff's reaching was limited to a few minutes at a time due to back, neck, and arm pain, and that cramping in her hands prevented fine motor activities.  (*Id.*)  He noted that Plaintiff used to sew but was no longer able to do so.  (*Id.*)  He also noted that she experienced "some decrease in sensation in [her] fingertips, some intermittent and some constant."  (*Id.*)  Dr. Phillips further opined that Plaintiff was

limited in her ability to be exposed to temperature extremes, dust, vibration, humidity/wetness, hazards, including machinery and heights, fumes, odors, chemicals, and gases. (*Id.*) Dr. Phillips explained that Plaintiff was cold intolerant due to increased pain in general, was intolerant to dust due to respiratory symptoms and increased somatic pain, was intolerant to humidity due to increased joint pain, and that her balance problems, leg pain, and back stiffness contributed to her limitations with respect to exposure to hazards. (*Id.*)

## 2. X-ray and MRI Results

On April 7, 2016, Plaintiff underwent X-rays of the lumbar spine, which revealed mild degenerative changes. (Tr. 520.) On the same day, Plaintiff also underwent X-rays of the cervical spine, which revealed "mild degenerative changes and intervertebral disc space narrowing within the cervical spine." (*Id.*) Plaintiff was diagnosed with cervical and lumbar spondylosis with radicular pain in the left upper extremity and right lower extremity, osteoarthritis, fibromyalgia, neck pain, and low back pain. (*Id.*)

After a motor vehicle accident on May 6, 2016, Plaintiff had X-rays taken of her cervical spine which showed minimal degenerative disc changes, disc space narrowing at C6-C7, and no acute abnormality. (Tr. 472.) On June 18, 2016, due to neck pain with upper extremity radiculopathy, Plaintiff underwent an MRI of the cervical spine without contrast, which showed:

Mild degenerative changes are appreciated with straightened cervical spine, narrow desiccated disc spaces as well as anterior

and posterior osteophytes maximally seen at the scanned lower cervical levels.

At C6-C7 disc level, a small central subligamentous soft disc herniation of protrusion type is seen effacing the anterior CSF space with resulting [] mild central ventral cord indentation. There is also mild bilateral exit foraminal narrowing by vertebral body osteophytes. The spinal canal displays no significant stenosis. The facet joints are normal bilaterally.

At C4-C5[,] [] C5-C6[,] and C7-T1 disc levels, small central focal annular disc bulges are seen effacing the anterior CSF space with resulting [] mild central ventral cord indentation. C5-C6 additionally shows mild bilateral exit foraminal narrowing by vertebral body osteophytes.

A fat containing hemangioma is noted at T5 vertebral body.

Normal scanned posterior fossa structures as well as craniocervical junction are seen.

The cord displays normal course and signal pattern.

Normal cervical alignment is seen.

The scanned muscular structures appear intact.

No fracture line can be detected.

(Tr. 476-77.) The impression was:

1. Mild degenerative changes are appreciated with straightened cervical spine.
2. C6-C7 disc level shows a small central subligamentous soft disc herniation of protrusion type. There is also mild bilateral exit foraminal narrowing by vertebral body osteophytes. The spinal canal displays no significant stenosis. The facet joints are normal bilaterally.
3. C4-C5[,] [] C5-C6[,] and C7-T1 disc levels show small central focal annular disc bulges. C5-C6 additionally shows mild bilateral exit foraminal narrowing by vertebral body osteophytes.
4. A fat containing hemangioma is noted at T5 vertebral body.
5. No fracture line can be detected.

(Tr. 477.)

## C.     The ALJ's Decision

At step two of the five-step sequential evaluation process,[4] the ALJ

found that Plaintiff had the following severe impairments: "[a]sthma,

COPD, fibromyalgia, neuropathy (feet), cervicalgia, obesity, major

depressive disorder, severe, recurrent, anxiety disorder[,] and personality

disorder."  (Tr. 18 (internal citation omitted).)  At step three, the ALJ

determined that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled the severity of one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 18-19.)

The ALJ then found that, through the date of the decision, Plaintiff had the

Residual Functional Capacity ("RFC") to perform less than the full range of

sedentary work, with the following limitations:

> [Plaintiff] is restricted to work that does not require climbing of
> ladders, ropes or scaffolds, nor more than occasional climbing [of]
> ramps[,] stairs, crawling, crouching, kneeling, and stooping; nor
> more than frequent balancing or overhead reaching with [the]
> bilateral upper extremities.  The claimant is limited to work that does
> not require more than frequent fingering bilaterally, such as fine
> manipulation of items no smaller than the size of a paper clip nor
> more than frequent handling of objects bilaterally, such as[] gross
> manipulation.  She is further limited to no more than a concentrated
> exposure to extreme temperatures, humidity, irritants such as fumes,
> odors, dust, gases or poorly ventilated areas.  She is further limited
> to work that is simple as defined in the DOT as SVP levels 1 and 2,
> routine and repetitive tasks in a work environment involving only
> simple[,] work[-]related decisions, with few, if any, work[-]place
> changes; and no more than occasional interaction with co-workers,
> supervisors[,] and the general public.

_____

[4] The Commissioner employs a five-step process in determining disability.  *See*
20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).

(Tr. 20.)  In making this finding, the ALJ considered, *inter alia*, Plaintiff's

symptoms, "the extent to which these symptoms can reasonably be accepted as

consistent with the objective medical evidence and other evidence," as well as

the opinions of treating, examining, and non-examining sources.  (Tr. 20-26.)

The ALJ found that Plaintiff's medically determinable impairments could

reasonably be expected to cause the alleged symptoms, but that Plaintiff's

"statements concerning intensity, persistence and limiting effects of th[e]

symptoms [were] not entirely consistent with the medical evidence and other

evidence in the record."[5]  (Tr. 21-22.)  Specifically, the ALJ considered Plaintiff's

---

[5] The ALJ summarized Plaintiff's subjective complaints, in part, as follows:
In her application documents, the claimant indicated she was[] disabled
due to her physical and mental conditions; her conditions cause[d] her
pain and other symptoms.  Her ability to work was[] limited by neuropathy
in both feet, asthma/COPD, fibromyalgia, obesity and depression.  At that
time, the claimant indicated that she was 4'11" and weighed 252 pounds.
The claimant has a 12th grade education (Exhibit 2E).
[S]he indicate[d] she lives with family.  "I take care of [my] mother, house[,]
and the dog."  She is able to perform personal care/grooming.  She does
some light domestic household/yard chores (with help).  She prepares
meals.  She drives . . . [and] . . . goes out alone.  She shops, counts
change, and uses a checkbook.  She generally gets along with authorities
and she has never lost employment due to interpersonal conflict.  She
does not like to be around people.  She has difficulty concentrating,
remembering and completing tasks.  She does not handle stress well
(Exhibit 6E).  . . .
At the hearing, the claimant testified that she had gained 31 pounds since
her application date . . . .
. . . [D]espite pain medication and chiropractic care, her pain remains
unchanged.  She also experiences pain radiating down her lower
extremities.  She alleges . . . she is unable to sit, stand or walk for even
short periods before needing to sit down and rest.  She can sit 20-30
minutes, stand 20 minutes, and walk a [half] of a mile.  She is unable to
stoop.  She alleges pain, swelling and tingling in her upper extremities; as
a result, she cannot perform overhead reaching, [and] requires help with

allegations of "back and neck pain, joint[] pain, pain in the upper and lower extremities, widespread pain, respiratory issues, obesity, [] anxiety and depression." (Tr. 22.) The ALJ determined that although Plaintiff had some "limitations in her ability to perform work-related activities, the medical evidence of record [did] not totally preclude her from performing these activities[,]" and that "[t]he objective diagnostic findings of record [did] not fully support [Plaintiff's] allegations." (*Id.*)

In evaluating the medical evidence, the ALJ summarized treatment notes from Dr. Phillips and his October 24, 2014 Fibromyalgia Questionnaire and Medical Source Statement restricting Plaintiff to less than sedentary exertion, as well as a consultative evaluation by Samer R. Choksi, M.D. dated October 16, 2014. (Tr. 22-23.) The ALJ also summarized additional treatment records from

---

dressing. She further alleges difficulties manipulating objects with both hands, and with lifting or carrying. The alleged pain is severe and keeps her awake at nights. The claimant further complains of worsening asthma; extreme temperatures, fumes, dust, pollens or "heavy" perfumes, and cleaning products would precipitate symptoms.
[C]laimant relates that she is obese and weighs 283 pounds. She does some home exercise but only for a few minutes. The claimant takes medication for high blood pressure, and asthma/COPD. She also alleges symptoms of anxiety and depression, for which her primary care physician(s) prescribed her various psychotropic medications. She also receives counseling sessions. However, despite the treatment, her symptoms remained unchanged. She experiences severe anxiety, isolation[,] and trouble interacting with others. The claimant has a driver's license and is able to drive . . . . The claimant relates that she lives in a house with her mother, stepfather[,] and[] aunt. Her daily activities are limited, but stated she would help with household chores. She spends most of her time sitting with "[her] mother and [her] aunt."
(Tr. 20.)

Dr. Phillips between March 2015 and September 2016, and noted that Plaintiff "mainly continued to visit Dr. Phillips for medication refills and that her physical exams were consistently within normal limits, as were her thought content, insight[,] and judgment." (Tr. 23.) The ALJ also cited to Dr. Character's October 2015 independent psychological examination and opinion that Plaintiff's "ability to maintain full time gainful employment was[] compromised by her medical conditions"; that "[h]er numerous medical problems [might] also have an impact on her ability to maintain employment on a consistent basis"; and that "[h]er severe depression and her avoidance of others would have a negative impact on her ability to function in an occupational setting." (*Id.*)

The ALJ also summarized the treatment records of Dr. Stephen A. Bookbinder, who evaluated and treated Plaintiff for fibromyalgia, as follows:

> On physical exam, she was morbidly obese, [with a] BMI [greater than] 50.00kg/m2. She did have some diffuse soft tissue tender points, but no evidence of palpable synovitis or diminished range of motion of [the] joints, or evidence of bony enlargement. Straight leg raising test was positive bilaterally. Dr. Bookbinder diagnosed the following[:] weight bearing pain radiating to buttocks, suggestive of lumbar radicular pain[;] cervical radicular pain[;] depression with probable associated fibromyalgia[;] osteoarthritis[;] neck pain[;] occasional numbness in [the] right hand[;] situational stress[;] soft tissue disorder[;] positive straight leg raise test bilaterally[;] and pain in multiple sites (Exhibit 9F).

(Tr. 23.) The ALJ noted an X-ray of the right hand taken in May 2016 revealed a deformity of the fifth joint, possibly related to an old injury or acute injury without any evidence of a fracture. (*Id.*) The ALJ then summarized the MRI and X-ray results from May and June 2016 following Plaintiff's motor vehicle accident. (Tr.

23-24.)  The ALJ noted that Dr. Bookbinder "referenced [X]-rays, which showed disc space narrowing at C5 that correlate[d] with her neck and left upper extremity symptoms and disc disease at L4-5 in her lumbar spine that correlate[d] with the pain going down her right leg."  (Tr. 24.)  He also quoted Dr. Bookbinder's observation that "X-rays helped to distinguish radicular pain and regional pain from fibromyalgia."  (*Id.*)  The ALJ noted that on physical exam, Plaintiff had "some mild tender points in the trapezius muscles and paraspinal areas[,]" but showed no neurological deficits.  (*Id.*)  He also noted that her diagnoses remained unchanged and that Dr. Bookbinder recommended that she continue with therapy.  (*Id.*)

The ALJ cited to evaluation and treatment records from Abdul Jabbar, M.D. for injuries Plaintiff sustained in a car accident in May 2016 and noted that she received chiropractic care through November 2016.  (*Id.*)  According to the ALJ, Dr. Jabbar found Plaintiff to be intact from a musculoskeletal and neurological standpoint and that her diagnoses were "sprain of ligament of the cervical spine and muscle spasm [of the] left scapula."  (*Id.*)  The ALJ then noted that Plaintiff complained to Dr. Bookbinder of left hip pain in January 2017, but "stated that she had been off her medication for four months."  (*Id.*)  The ALJ then cited to Dr. Bookbinder's findings as follows: "Dr. Bookbinder noted positive muscle tenderness affecting the right hip, hands and knees and positive tender points.  The diagnosis was hip pain (Exhibit 16F).  Progress notes through July 2017 revealed significant improvement in the claimant's symptoms with

medication (Exhibit 29F)." (*Id.*) The ALJ also noted that Dr. Phillips treated Plaintiff through April 2017 for multiple conditions, but "found nothing on physical examinations," that she was "mentally intact," and that his "only recommendations were for [Plaintiff] to take her medications, exercise and lose weight (Exhibits 20F and 27F) but [Plaintiff] was non-compliant." (*Id.*)

The ALJ also summarized, *inter alia*, the opinions of Jared Reeves, M.D., an expert board certified in physical medicine and rehabilitation, who completed a medical interrogatory based on the medical evidence of record and restricted Plaintiff to medium exertional work. (*Id.*) The ALJ also summarized the medical opinions of Robert K. Heidrich, Psy.D., who completed a medical interrogatory based on a review of the medical evidence of record and found that Plaintiff's depressive disorder and anxiety did not meet or medically equal any of the Listings. (Tr. 24-25.)

The ALJ determined that the "objective medical evidence of record establishe[d] that the claimant ha[d] a history of physical and mental conditions that could reasonably [be] expected to cause some of the symptoms and the limitations that she allege[d], but not to the extent to which she allege[d] them." (Tr. 25.) The ALJ concluded that Plaintiff's subjective complaints were only partially consistent with the evidence of record. (*Id.*) He also explained:

> As for the opinion evidence, no treating doctor reported that the claimant was disabled or unable to work for the period under adjudication. Various treating sources noted a history of musculoskeletal pain and joints [sic] pain (hands and feet), but the medical workup has been negative with no significant physical

pathology.  The claimant ambulated without a cane.  Cervical spine MRI and various [X]-rays from 2013 through 2016 showed mild [degenerative disc disease] throughout the cervical spine (Exhibits 11F and 13F); various hand [X]-rays from 2013 through 2016 were negative (Exhibits 3F, 10F).  Although the claimant did receive treatments for the allegedly disabling (pain) impairment(s), that treatment was essentially routine and/or conservative in nature.  Moreover, the medical records reveal that medications were relatively effective in controlling the symptoms.  Notations consistently show she was neurovascularly intact from an orthopedic standpoint . . . .  This is also confirmed by the consultative examiner (Exhibit 3F) and the medical expert (Exhibit 25F).  Regarding the claimant's asthma, she had a negative chest [X]-ray (Exhibit 1F), but the medical evidence of record [was] devoid of any pulmonary function test or respiratory therapy assessments documenting asthma or any reactive airway disease. The medical records revealed that medications were relatively effective in controlling her symptoms.  While she may have experienced symptoms of anxiety and depression, the record reflects mild symptoms and significant improvement with psychotropic medication [] and mental health treatment [].  This [is] also confirmed by the medical expert (Exhibit 26F).  Treating sources['] opinions support a finding that the claimant could perform a range of sedentary work as set forth in the above referenced RFC assessment.  In addition, the undersigned observed the claimant throughout the hearing and she did not appear to be in any significant distress.

In addition, the claimant remains able to engage in a wide array of activities of daily living despite her impairments, as she testified to at the hearings. I find the claimant's statements (Exhibits 6E, 3E, 1F, 3F and 7F, and hearing testimony) to be reliable.  The claimant has a number of impairments, but I have incorporated the limitations due to those impairments into the above-referenced RFC assessment.  Significantly, she is able to do housework independently[,] such as sweeping, mopping, and vacuuming floors.  She cleans sinks/tubs and does the laundry and cooking for family members (Exhibit 3F).  Moreover, she is apparently able to care for her "disabled" mother, at home, which can be quite demanding, both physically and emotionally; she also takes her to various doctor's appointments (Exhibits 1F, 3F[,] and 6F).

(*Id.*)

The ALJ then explained that he had given minimal weight to the opinions of the State agency psychological consultants, Keith Bauer, Ph.D. and Julie Bruno, Psy.D., and significant weight to the opinion of the State agency reviewing physician Larry Meade, D.O., whose physical limitations the ALJ incorporated into the RFC and finding that his "opinion [was] consistent with the medical evidence of record." (Tr. 26.) The ALJ accorded minimal weight to the opinion of Dr. Character because her mental limitations on examination were more restrictive than what the ALJ found "to be consistent with the medical evidence of record." (*Id.*) The ALJ gave significant weight to the opinion of consultative examiner Dr. Choksi, finding that the "physical and mental limitations on examination [were] consistent with the medical evidence of record and [his] RFC." (*Id.*) The ALJ then accorded moderate weight to Dr. Phillips, reasoning as follows: "I gave moderate weight to treating source, Dr. Phillips (Exhibit 4F) whose fibromyalgia questionnaire is more restrictive than what I find to be consistent with his own treatment notes and with the medical evidence of record. I have incorporated some of the limitations into my RFC." (*Id.*) The ALJ also gave moderate weight to the opinions of "medical experts Drs. Reaves (Exhibit 25) and Heidrich (Exhibit 26F) [as] both findings [were] less restrictive than what [he] [found] to be consistent with the medical evidence of record." (*Id.*)

At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work. (*Id.*) At step five, after considering Plaintiff's age, education, work experience, and RFC, as well as the testimony of the vocational expert

("VE"), the ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could perform such as lens inserter, lens block gauger, and stone setter.  (Tr. 27.)  As noted in the ALJ's decision, all of these representative occupations are sedentary with an SVP of 2.  (*Id.*)  Thus, the ALJ concluded that Plaintiff was not disabled from July 15, 2010 through the date of the decision.

### D.    Analysis

Plaintiff argues that the ALJ failed to apply the correct legal standards to Dr. Phillips' opinion as he "failed to articulate any reason supported by substantial evidence as to why he did not accord Dr. Phillips' opinion significant or controlling weight."  (Doc. 20 at 11.)  Plaintiff argues that while the ALJ cited to Dr. Phillips' treatment notes and the medical evidence of record generally, he failed to cite to any specific inconsistencies.  (*Id.*)  According to Plaintiff, the ALJ's reason for according the opinions of Dr. Phillips only moderate weight was conclusory and failed "to provide the requisite good cause for his more restrictive opinions."  (*Id.*)  The undersigned agrees.

In giving the opinions of Dr. Phillips moderate weight, the ALJ claimed that the Fibromyalgia Questionnaire was more restrictive than what the ALJ found to be consistent with Dr. Phillips' own treatment notes and with the medical evidence of record.  However, the ALJ did not explain what treatment notes or medical evidence of record he was referring to.  In the absence of such an explanation, it is impossible for the Court "to determine whether the ultimate

19

decision on the merits of the claim is rational and supported by substantial evidence." *Winschel*, 631 F.3d at 1179 (also noting that "when the ALJ fails to state with at least some measure of clarity the grounds for his decision, [the Court] will decline to affirm simply because some rationale might have supported the ALJ's conclusion").

Although the ALJ purportedly gave some weight to Dr. Phillips' Fibromyalgia Questionnaire, and claimed to have incorporated some of the limitations noted therein into the RFC, he did not explain which findings he credited, which findings he rejected, or the reasons therefor.  As shown above, the ALJ's reasons for weighing the medical opinion evidence were too vague to allow for a meaningful review.  The ALJ's claim that the treating opinion of Dr. Phillips was not consistent with his treatment notes or the medical evidence are not supported by substantial evidence.  Here, the examination findings revealed, *inter alia*, that Plaintiff suffered from fibromyalgia, cervicalgia, intermittent hand numbness, neuropathy, decreased range of motion, hand cramps and wrist pain, muscle spasms, joint pain and stiffness, weightbearing pain radiating to buttocks suggestive of lumbar radicular pain, tenderness affecting the right hip, hands, and knees.  (*See* Tr. 422, 438, 466-69, 514-25, 530-31, 628-35, 649.)

Further, the treatment records consistently demonstrated severe or moderate pain levels.  (*See, e.g.*, Tr. 382, 388, 438, 769, 774, 776, 778, 780, 782, 784-86, 788, 790, 792, 794, 796, 798, 800, 802, 804, 806, 808-10, 812.) The record also reflected that Plaintiff's symptoms were exacerbated by moving

in certain directions, lifting, sitting, standing, and walking, and that her symptoms interfered with her daily activities. (*See, e.g.*, Tr. 300-18, 382-84, 386, 388, 466, 808; *see also* Tr. 786 (noting, on September 12, 2016, that Plaintiff's Oswestry Disability Index score was 48, which represented "severe disability" and that she had difficulty "performing personal care, lifting, working, concentrating, sleeping, driving, reading, and performing recreational activities").)

In addition, Plaintiff's abnormal MRIs, X-rays, and tender point examination results were consistent with the reported symptoms. (*See, e.g.*, Tr. 426 (identifying 15 out of 18 tender spots and confirming Plaintiff's fibromyalgia diagnosis); Tr. 472 (noting, as of May 6, 2016, cervical spine showed disc space narrowing at C6-C7); Tr. 476-77 (noting, as of June 18, 2016, small central subligamentous soft disc herniation of protrusion type at C6-C7 disc level as well as mild bilateral exit foraminal narrowing by vertebral body osteophytes, small central focal annular disc bulges at C4-C5, C5-C6, and C7-T1 disc levels, and mild bilateral exit foraminal narrowing by vertebral body osteophytes at C5-C6); Tr. 524 (noting some soft diffuse soft tissue tender points and positive straight leg raising bilaterally); Tr. 531 (diagnosing Plaintiff with neck, cervical, thoracic, and lumbar sprain, sacroiliac joint sprain, muscle spasms, myalgia, and cervicobranchial syndrome).)

In light of these findings, Plaintiff was diagnosed with, *inter alia*, primary fibromyalgia syndrome, osteoarthritis, cervicobranchial syndrome, cervical and lumbar spondylosis with radicular pain, depression and anxiety. (*See, e.g.*, Tr.

468, 500-02, 520-21.)  Plaintiff's treatment included muscle relaxers, nerve pain medication, chiropractic adjustment, and therapy.  As the record reflects, treatment for Plaintiff's neck and lower back pain plateaued as she continued to experience pain and limited range of motion. (*See, e.g.*, Tr. 808-10 (noting, as of November 8, 2016, that Plaintiff's condition had plateaued and had reached maximum medical improvement despite pain at C5-C6 and at L4-L5 and limited range of motion); *see also* Tr. 811-12 (noting, as of May 23, 2017, 7/10 pain level in left triceps, left posterior elbow, forearm, wrist and left posterior hand numbness and tingling; 9/10 pain level in the lumbar spine; 7/10 pain level in left posterior pelvis/hip and right posterior pelvis/hip; spinal restrictions/subluxations at C4, T1, T9, L1, L4; pain and tenderness in the cervico-thoracic, mid-thoracic and lumbo-sacral areas; moderate to severe muscle spasms in the lumbar, lower thoracic and mid thoracic areas; and the entire lumbar and cervical spine was recorded as mildly reduced with pain noted).)

Based on the foregoing, the ALJ's reasons for discounting the treating opinions of Dr. Phillips were vague and also appear to be unsupported by substantial evidence.  Because the undersigned concludes that the ALJ erred in his evaluation of the medical opinion of Dr. Phillips, the Court will not separately address Plaintiff's argument regarding the weight the ALJ attributed to Dr. Character's opinions.  Therefore, this case will be reversed and remanded for further proceedings.

Accordingly, it is **ORDERED**:

1.      The Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with this Order, pursuant to sentence four of 42 U.S.C. § 405(g) with instructions to the ALJ to conduct the five-step sequential evaluation process in light of all the evidence, including the opinion evidence from treating, examining, and non-examining sources, and conduct any further proceedings deemed appropriate.

2.      The Clerk of Court is directed to enter judgment accordingly, terminate any pending motions, and close the file.

3.      In the event that benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) & 1383(d)(2)*, Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov. 13, 2012).  This Order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

   **DONE AND ORDERED** in Jacksonville, Florida, on March 24, 2020.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record